**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **CRIMINAL NO. 06-19** |
| | : | |
| **ANTHONY MARK BIANCHI** | : | |

**MEMORANDUM AND ORDER**

**Kauffman, J.**                                                                      **January   8   , 2009**

Now before the Court is Defendant's Motion for Judgment of Acquittal or New Trial (the "Motion"). For the reasons set forth below, the Motion will be denied.

## I.      BACKGROUND

This case presents an extraordinarily important issue: When the Government's conduct intentionally precludes the attendance at trial of a member of the defense team, is the defendant entitled to a new trial if he fails to prove actual prejudice resulting from the misconduct?

On February 1, 2007, a grand jury sitting in the Eastern District of Pennsylvania issued a Second Superseding Indictment charging Defendant Anthony Mark Bianchi ("Defendant") with conspiracy to engage in illicit sexual conduct in foreign places in violation of 18 U.S.C. § 2423(e) (Count One); traveling with the intent to engage in illicit sexual conduct in violation of 18 U.S.C. § 2423(b) (Counts Two, Four, Six, Eight, and Nine); engaging in illicit sexual conduct in foreign places in violation of 18 U.S.C. § 2423(c) (Counts Three, Five, Seven, and Ten); and using a facility in foreign commerce to entice a minor to engage in sexual activity in violation of

1

18 U.S.C. § 2422(b) (Counts Eleven and Twelve).

By a letter dated Saturday, July 14, 2007, with Defendant's trial scheduled to begin on Monday, July 16, 2007, the Government notified the Court that it was obtaining a warrant to charge Victor Levintsa ("Levintsa"), a Moldovan lawyer who it knew was assisting the defense, with witness intimidation in violation of 18 U.S.C. § 1512.  See July 14, 2007 Letter, admitted as Court Exhibit 1 at Trial ("Ct. Ex. 1").  The same day, the Government notified defense counsel by telephone of its decision to arrest Levintsa if he came to the United States.  The Government then obtained the arrest warrant from Magistrate Judge M. Faith Angell.  See Arrest Warrant for Victor Levintsa dated July 14, 2007, attached to Gov't Resp. at Exhibit B ("Ex. B").[1]

The Court conducted a hearing regarding the Government's actions on July 16, 2007, prior to the start of trial.  At the hearing, the Government withdrew the warrant and informed the Court that Levintsa could testify in the United States without threat of arrest for the conduct that formed the basis of the warrant.  On July 17, 2007, Regional Security Officer Cameron Burks obtained assurances from the Moldovan Government that it would not charge or question Levintsa or prohibit him from leaving Moldova in conjunction with the alleged witness intimidation, and that it would postpone a criminal investigation until further notice from the United States.  See Burks Decl., attached to Gov't Supplemental Reply at Ex. 1.  Nevertheless, Levintsa refused to come to the United States to testify.  The defense agreed to arrange for him to testify by live video feed from Moldova even though Defendant's counsel asserted that "it was not clear that a live deposition of Levintsa would or could serve as an adequate substitute for his

---

[1]     The criminal complaint and arrest warrant against Levintsa were sealed until August 8, 2007.

in-court testimony." Def. Mot. 8.  However, on the morning of July 25, 2007, the day Levintsa

was scheduled to arrange the video feed, and despite the Government's assurances, he received a

phone call from a Moldovan police officer, Iurie Slivciuc ("Slivciuc"), who "told [Levintsa] that

he had questions to [ask Levinsta] and invited [him] to come to the [Moldovan Center for

Combating Trafficking in Persons ("CCTIP")] of the Ministry of the Interior."  "Explanation"

from Victor Levintsa to Director of the CCTIP dated July 27, 2007, attached to Gov't Resp. at

Exhibit E ("Ex. E").  Levintsa informed Slivciuc that under Moldovan law, he was not allowed to

provide any information regarding his professional activities with respect to this case.  See id.

Levintsa claims that Slivciuc responded that he could subpoena him, fine him, or issue a warrant,

so he met with Slivciuc that evening.  See id.

Levintsa subsequently executed a declaration dated July 25, 2007, stating that he no

longer was willing to cooperate with the defense due to "the intimidation of both the United

States Attorney General and the Moldovan Police."  July 25, 2007 Decl. of Victor Levintsa ¶ 15,

admitted as Court Exhibit 2 at trial ("Ct. Ex. 2").[2]  At the Court's request, the Government

investigated whether the United States had a role in the events of July 25, 2007.  The

Government obtained a letter from the United States Ambassador to Moldova, Michael D. Kirby,

which stated that "[i]n no way was [the July 25 interview] sought or requested by the Embassy.

Subsequent to learning that this interview took place, we have been in touch with the

Government of Moldova, and have confirmed that Mr. Levintsa is not the target of a criminal

investigation at this time.  We have further confirmed that he is free to depart Moldova at any

---

[2]       He also stated that the police officer told him that the request for investigation
came from the U.S. Embassy in Moldova, and that further action would be considered by the
Office of the Prosecutor General.   Ct. Ex. 2 ¶ 14.

3

time and is free to provide testimony in this case." July 26, 2007 Letter from Ambassador Kirby, admitted as Court Exhibit 4 at Trial ("Ct. Ex. 4"). The letter further stated that "[i]n the interests of ensuring a fair trial, the Embassy is at the disposal of the Court to provide any assistance which may be required to permit Mr. Levintsa to participate fully." Id. The Government also obtained a letter of assurance from the Deputy Director of the CCTIP which stated that "Mr. Victor Levita [sic] is not a target of criminal investigation. Also . . . Mr. Levinta [sic] is free to travel outside the Republic of Moldova. Furthermore, we would like to inform you that Mr. Victor Levinta [sic] can provide video testimony from the Republic of Moldova to the United States. We would like to assure you that the Center of Combating Trafficking in Persons will assist Mr. Victor Levinta [sic] to conduct this testimony." July 26, 2007 Letter from Deputy Director of the CCTIP, admitted as Court Exhibit 5 at Trial ("Ct. Ex. 5").

Despite the assurances obtained by the Government, Levintsa remained unwilling to travel to the United States or to testify via video feed. The Court then proposed that a declaration from Levintsa be prepared and read to the jury. Levintsa agreed to work with the defense on a declaration containing all of the information that would have been included in his testimony at trial.[3] After the Court ruled on objections from the parties regarding Levintsa's proposed declaration, defense counsel read the revised declaration to the jury with no opportunity for the Government to cross-examine. See July 30, 2007 Decl. of Victor Levintsa, attached to Gov't Resp. at Exhibit F ("Ex. F"). At the close of trial, the jury returned a verdict of guilty on Counts

---

[3] The defense agreed to proceed with the trial using Levintsa's declaration rather than move for a mistrial, but reserved the right to bring a post-trial motion addressing the issues surrounding Levintsa.

One through Five and Counts Eight through Twelve of the Second Superseding Indictment.[4]

Defendant subsequently filed the instant Motion.

Defendant asserts that the Government's notification of its decision to obtain a warrant for Levintsa's arrest deprived him of his ability to call Levintsa as a witness for the defense and also deprived him of Levintsa's assistance during the course of trial.  He alleges violations of his rights to: (1) due process under the Fifth Amendment, (2) an impartial jury trial under the Sixth Amendment, (3) compulsory process for obtaining witnesses in his favor under the Sixth Amendment, and (4) assistance of counsel under the Sixth Amendment.  See Def. Mot. 1-2. Defendant's Motion and supporting papers do not include any argument with respect to the impartial jury claim other than an initial blanket assertion that the right was violated.

## II.    LEGAL STANDARD

### A.    Legal Standard Under Rule 29

Federal Rule of Criminal Procedure 29 provides, in relevant part, that the trial court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  The Supreme Court has held that the critical inquiry on review of the sufficiency of evidence "is whether, after viewing the evidence in the

---

[4]         The jury found Defendant guilty on Count Three, engaging in illicit sexual conduct in a foreign place, from on or about December 2, 2003 through on or about December 24, 2003, in violation of 18 U.S.C. §§ 2423(c) and (e), but did not find him guilty with respect to one of the three alleged victims, MM.  Similarly, the jury found Defendant guilty on Count Five, engaging in illicit sexual conduct in a foreign place, from on or about January 17, 2004 through on or about February 8, 2004, in violation of 18 U.S.C. § 2423(c), but did not find him guilty with respect to one of the three alleged victims, AS.  The Court granted the Government's Motion to Dismiss Counts Six and Seven of the Second Superseding Indictment at the close of evidence.

light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979); <u>see also</u> <u>United States v. Taftsiou</u>, 144 F.3d 287, 290 (3d Cir. 1998) (explaining that review of a Rule 29 motion requires the Court to "interpret the evidence in the light most favorable to the government as the verdict winner" (citing <u>United States v. Rieger</u>, 942 F.2d 230, 232 (3d Cir. 1991))).

     **B.**     **Legal Standard Under Rule 33**

     Federal Rule of Criminal Procedure 33 provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The decision to grant a new trial lies within the discretion of the Court. <u>See, e.g.</u>, <u>United States v. Henry</u>, 2007 WL 2458555, at *2 (E.D. Pa. Aug. 24, 2007). Rule 33 "may be applied where there is a finding of prosecutorial misconduct, as well as when the trial court does not believe that the evidence supports the jury's verdict." <u>United States v. Dixon</u>, 658 F.2d 181, 193 (3d Cir. 1981) (citation omitted); <u>see also</u> <u>Henry</u>, 2007 WL 2458555, at *2 ("In exercising its discretion, the court may grant a motion for a new trial on one of two grounds. First, the court may grant the motion if, after weighing the evidence, it determines that there has been a miscarriage of justice. Second, the court must grant a new trial if trial error had a substantial influence on the verdict." (citations and internal quotation marks omitted)). The Court should grant a new trial on the basis of trial errors "only when the errors, when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial." <u>United States v. Faison</u>, 2006 WL 2473640, at *2 (E.D. Pa. Aug. 23, 2006) (internal quotation marks omitted) (quoting <u>United States v. Copple</u>, 24 F.3d 535, 547 n.17 (3d Cir.1994)).

III.   **ANALYSIS**

The Supreme Court has "recognized that, given the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and that the Constitution does not guarantee such a trial." United States v. Hasting, 461 U.S. 499, 508-09 (1983) (finding that the prosecutor's reference to the defendant's failure to testify—a violation of the Fifth Amendment—was harmless).  However, the Supreme Court also has recognized that "certain errors may involve 'rights so basic to a fair trial that their infraction can never be treated as harmless error.'"  Id. at 509 n.6 (quoting Chapman v. California, 386 U.S. 18, 23 (1967)).[5]  "[I]t is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations."  Id. (noting that in failing to apply the harmless error standard, the Court of Appeals "failed to strike the balance between disciplining the prosecutor on the one hand, and the interest in the prompt administration of justice and the interests of the victims on the other").

"As a general matter, even when actions by the prosecution appear to deprive a criminal defendant of his constitutional right to present a defense, no remedy will lie for such infringement absent a showing that the government has caused the unavailability of material evidence and has done so in bad faith."  United States v. Santtini, 963 F.2d 585, 596-97 (3d Cir. 1992).  The Third Circuit has stated that "[w]hen we evaluate whether alleged prosecutorial misconduct has cast an impermissible taint upon a trial, we ask whether the alleged misconduct

_____

[5]   The Court in Hasting specified the right not to be coerced into a confession, the right to counsel, and the right to an impartial judge as examples of errors that can never be harmless.  461 U.S. at 509 n.6.

. . . was 'sufficiently prejudicial' to violate a defendant's due process rights." United States v. Bates, 46 F. App'x 104, 110 (3d Cir. 2002) (citing United States v. Scarfo, 685 F.2d 842, 849 (3d Cir. 1982)).  "In order for prosecutorial misconduct to merit a reversal," the Court "must find that it is more probable than not that the alleged misconduct influenced the jury's ultimate verdict." Id.  With these general guiding principles in mind, the Court will analyze each of Defendant's arguments using the specific standards set forth under the Fifth and Sixth Amendments.

## A.     Due Process Under the Fifth Amendment

### 1.     Legal Standard

"Due process guarantees that a criminal defendant will be treated with 'that fundamental fairness essential to the very concept of justice.  In order to declare a denial of it, [the Court] must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial.'" United States v. Valenzuela-Bernal, 458 U.S. 858, 872 (1982) (quoting Lisenba v. California, 314 U.S. 219, 236 (1941)).  The "touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips, 455 U.S. 209, 219 (1982) (finding that the prosecutor's failure to disclose that a juror had applied to work as an investigator in the district attorney's office did not deprive the defendant of a fair trial).  "[T]he aim of due process 'is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused.'"  Id. (quoting Brady v. Maryland, 373 U.S. 83, 87 (1963)).

The Third Circuit has stated that "[i]ntimidation or threats from the government that dissuade a potential witness from testifying may infringe a defendant's . . . right to due process

and Sixth Amendment right to compulsory process."  Lambert v. Blackwell, 387 F.3d 210, 260 (3d Cir. 2004).  "In order to violate the Constitution, the government's conduct must have 'substantially interfered' with a [witness's] choice to testify."  Id.  "Whether substantial interference occurred is a factual determination."  Id.

Defendant argues that the Third Circuit's decision in United States v. Morrison, 535 F.2d 223 (3d Cir. 1976), holds that when a witness is deterred from testifying by actions of the Government, any conviction must be set aside, irrespective of the Government's good faith or a claimed lack of prejudice to the defendant.[6]  In Morrison, the Court found that the Government's repeated warnings to the defendant's girlfriend—who allegedly was prepared to testify that it was she and not the defendant who had committed the crime—that she could be arrested if she incriminated herself on the stand violated the defendant's right to due process and was not a harmless error.  See id. at 227-28.  In reaching its decision, the Third Circuit relied on the Supreme Court's decision in Webb v. Texas, 409 U.S. 95 (1972), to adopt a per se rule that did not take materiality, prejudice, or bad faith into consideration, stating that "where the Government has prevented the defendant's witness from testifying freely before the jury, it cannot be held that the jury would not have believed the testimony or that the error is harmless."[7] Morrison, 535 F.2d at 228.

In numerous cases after Morrison, however, the Supreme Court has concluded that the

---

[6]     Defendant cites to cases in other circuits with similar holdings.  However, as will be discussed infra, these cases, like Morrison, no longer represent the current state of the law.

[7]     In Webb, the Supreme Court reversed a Texas state court and found that the defendant had been denied due process where the trial judge unnecessarily singled out the defendant's only witness for a lengthy admonition on the dangers of perjury, thus causing the witness to refuse to testify.

harmless error standard applies to nearly every case involving alleged constitutional violations. See, e.g., Hasting, 461 U.S. at 509 ("[T]he Court has consistently made clear that it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations."); Valenzuela-Bernal, 458 U.S. at 873 (explaining that a violation of the Fifth and Sixth Amendments based on lost witness testimony "requires some showing that the evidence lost would be both material and favorable to the defense"); Phillips, 455 U.S. at 220 ("[T]he Court of Appeals erred when it concluded that prosecutorial misconduct alone requires a new trial.").  Moreover, although the Third Circuit has not explicitly overruled Morrison, it has, like most other circuits that originally adopted a per se rule, incorporated materiality and bad faith into the standard in light of Supreme Court decisions issued after Webb. See, e.g., Santtini, 963 F.2d at 596-97 ("[E]ven when actions by the prosecution appear to deprive a criminal defendant of his constitutional right to present a defense, no remedy will lie for such infringement absent a showing that the government has caused the unavailability of material evidence and has done so in bad faith."); United States v. Emuegbunam, 268 F.3d 377, 400 (6th Cir. 2001) ("[G]overnmental conduct must amount to a substantial interference with a witness's free and unhampered determination to testify before we will find a violation of due process or the Sixth Amendment.  Even when such interference occurs, a violation of a defendant's right to call witnesses in his defense is subject to harmless error analysis." (citation omitted)); United States v. Foster, 128 F.3d 949, 953 (6th Cir. 1997) ("[E]ven if a defendant is able to prove prosecutorial misconduct amounting to substantial interference with a witness, that misconduct will not result in a new trial if it can be said to be harmless."); United States v. Anderson, 1994 WL 24961, at *2 (5th Cir. 1994) (noting that the rule of per se prejudice when

the government interferes with a defense witness has been "modified" and that "[t]o prevail on such a [due process] claim, the defendant now must show how she was prejudiced by the interference"); United States v. Saunders, 943 F.2d 388, 392 (4th Cir. 1991) ("When a defendant is able to establish a substantial government interference, the inquiry moves to the question of whether it was prejudicial or harmless error.").[8]

The Supreme Court's decision in Valenzuela-Bernal is particularly instructive.  In that case, the Government deported illegal aliens who were witnesses to the crime at issue.  The Supreme Court held that the defendant could not establish a violation of due process under the Fifth Amendment based on the Government's action in deporting those witnesses unless "there is some explanation of how their testimony would have been favorable and material to the defense."  458 U.S. at 872-73; see also id. at 873 ("Sanctions may be imposed on the Government for deporting witnesses only if the criminal defendant makes a plausible showing that the testimony would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses." (emphasis added)).  The Supreme Court went on to state that "[a]s in other cases concerning the loss of material evidence, sanctions will be warranted for deportation of alien witnesses only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact."  Id. at 873-74 (citing Giglio v. United States, 405 U.S. 150, 154 (1972)).  Thus, the case squarely rejects the notion that the deprivation of a witness is a per se violation of a defendant's due process rights.

---

[8]       The Eighth Circuit also has refused to adopt a per se rule because (1) its prior decisions make clear that the harmless error doctrine applies in witness intimidation cases and (2) the Supreme Court's decision in Hasting, 461 U.S. 499, which came after Webb, undermines the notion of a per se rule.  See, e.g., Peeler v. Wyrick, 734 F.2d 378, 381 (8th Cir. 1984).

In <u>Santtini</u>, 963 F.2d 585, a previously unindicted co-conspirator of the defendant fled the United States to Columbia, after which he sent a statement to the Government exculpating all his alleged co-conspirators, contending that he acted alone and only had implicated his co-conspirators in prior conversations with the Government in order to gain his own freedom.  <u>Id.</u> at 588.  In an attempt to obtain an admissible Rule 15 deposition of the fugitive, defense counsel persuaded him to agree to a deposition at the U.S. Embassy in Costa Rica if the district court sanctioned an agreement that he not be arrested when he appeared at the deposition.  <u>Id.</u> at 589. The Government refused to agree not to arrest the fugitive at the end of the deposition, effectively guaranteeing that the witness would not appear.  <u>Id.</u>  Over the Government's objection, the district court ordered the Government not to arrest the fugitive.  <u>Id.</u>  The principles discussed by the Third Circuit in reaching its decision are relevant in that the appellate court had to consider whether the defendant's Fifth and Sixth Amendment rights mandated upholding the lower court's order.  The <u>Santtini</u> court stated that "[a]s a general matter, even when actions by the prosecution appear to deprive a criminal defendant of his constitutional right to present a defense, no remedy will lie for such infringement absent a showing that the government has caused the unavailability of material evidence and has done so in bad faith."  <u>Id.</u> at 596-97.[9]

_____

[9]      Lost evidence is material "only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact."  <u>Gov't of the Virgin Islands v. Mills</u>, 956 F.2d 443, 446 (3d Cir. 1992) (quoting <u>Valenzuela-Bernal</u>, 458 U.S. at 874). Defendant relies heavily on <u>dicta</u> in <u>Mills</u> citing <u>Morrison</u> with approval and characterizing the case as standing for the proposition that "where the government has prevented the defendant's witness from testifying freely before the jury, error cannot be harmless."  <u>Id.</u> at 448.  While this <u>dicta</u> supports Defendant's argument for a <u>per se</u> rule, the Court is bound by the Third Circuit's more recent pronouncement in <u>Santtini</u> that a showing of prejudice (<u>i.e.</u>, that material evidence was unavailable) is required before a defendant is entitled to a remedy.

## 2.    Prosecutorial Misconduct

As the Court stated at the October 2, 2008 hearing, "Did anyone really believe that after being informed that he was going to be arrested if he came to the United States, there was a chance . . . that Mr. Levintsa would come?  I mean, that clearly, you had to understand, was a stop order for Mr. Levintsa coming to the United States."  Oct. 2, 2008 Hr'g Tr. 163.  Later in the same hearing, the Court continued, "If [the Government] really wanted to arrest him, what [it] would have done is let him come here and then arrest him."  Id. at 170.[10]

At the October 20, 2008 hearing, the Court concluded that "[b]y giving [Levintsa] advance notice that he was going to be arrested if he came, it proved . . . that [the Government] really didn't want to arrest him.  That wasn't their motive."  Oct. 20, 2008 Hr'g Tr. 11.  Instead, the motive was to prevent Levintsa from coming to the United States to assist with Defendant's defense.[11]  Accordingly, the Court finds as a fact that the decision to notify Levintsa of the arrest warrant was designed to deter him from traveling to the United States to assist with Defendant's

---

[10]    No argument has been made that the Government cannot obtain an arrest warrant when it has probable cause to believe that an individual has violated federal law.  Nor has it been argued that once an arrest warrant is obtained, the Government may not arrest that individual. The question before the Court is whether it was proper to notify Defendant's counsel of its intention to obtain an arrest warrant, effectively guaranteeing that Levintsa would not travel to the United States.

[11]    The Government was given the opportunity to explain alternative reasons for notifying Defendant's counsel of the arrest warrant, but it elected to assert its privilege as to its deliberative process.  See, e.g., In re United States of Am., 398 F.3d 615, 618 (7th Cir. 2005) ("[T]he United States Attorney is not answerable to a judge for the deliberations among his staff. The intra-office conversations and memoranda that the judge wants to see are covered by multiple privileges. . . . [F]ederal judges may not insist that prosecutors reveal deliberative or pre-decisional materials. . . . The Judicial Branch is limited to assessing counsel's public deeds.").  Because the Government has elected not to disclose any other motive for notifying Defendant's counsel of the warrant, the Court concludes that the Government did not want to arrest Levintsa, but instead wanted to prevent him from attending the trial in the United States.

13

trial.

The Government contends that the first time it became aware that Levintsa would be a defense witness was three hours after AUSA Mann notified defense counsel that the Government intended to arrest Levintsa.  See Gov't Resp. 8-9.  Even though there had been several requests for reciprocal discovery from the defense, and the Court had ordered the production of defense witness statements on June 21, 2007, the defense had not identified any witness other than those identified in the Rule 15 depositions.  See id. at 8.[12]  The July 14, 2007 letter to the Court identifies Levintsa merely as "the Moldovan attorney that the defense has referred to in previous filings" and states that he was present at the Rule 15 depositions (although he was introduced at the deposition by defense counsel only as "Victor, our video guy").  See Ct. Ex. 1. While the Government concedes that it knew that Levintsa would have provided "some type of support to the defense," Gov't Resp. 9, Defendant points to no evidence that the Government was aware that Levintsa would be a witness at trial.

### 3.    Prejudice

Even assuming, however, that the Government's decision to notify Levintsa of the arrest warrant started an inexorable chain of events that resulted in his refusal to travel to the United States, and even assuming that the Government was aware that Levintsa intended to be a defense witness, any prejudice resulting from Levintsa's absence was rendered harmless by reading to the jury the declaration containing his testimony.  After it became apparent that Levintsa would not

---

[12]    In a recent submission to the Court, Defendant claims that Levintsa was "the key defense witness in this case" and would have been "the sole live witness to testify on Mr. Bianchi's behalf."  Def. Supplemental Mem. 8.  He offers no explanation why he failed to identify such an integral component of the defense as a witness despite being ordered by the Court on June 21, 2007 to do so.

testify via video feed, the Court provided the defense team with time to work with Levintsa to draft a declaration containing the testimony he would have presented at trial.  The declaration testimony was not subject to cross-examination by the Government, and in fact contained some evidence—for example, hearsay testimony—that otherwise would not have been admissible. Further, the Court made plain to the jury that Defendant was not responsible for the non-appearance of Levintsa.

Defendant argues that he was prejudiced by the absence of Levintsa's live testimony, particularly because Levintsa had interviewed a number of witnesses during the course of his investigation in Moldova and had firsthand knowledge of "relevant conditions" in that country, such as the manner in which criminal cases are investigated and handled, and facts suggesting that witnesses may have been pressured to testify against Defendant.  Def. Mot. 4-5.[13]

Significantly, Levintsa's testimony would not have exonerated Defendant.  Rather, his testimony, to the extent it would have been admissible, at best would have served as impeachment evidence with respect to the alleged victims' testimony.  This impeachment testimony, such as Levintsa's contention that the boys he interviewed denied that any sexual contact had occurred, was cumulative since the defense cross-examined the boys at trial about other instances in which they admittedly had provided inconsistent statements of what had transpired with Defendant or had otherwise denied that any illicit conduct occurred.  As the Supreme Court has explained, the Court's aim in such cases is not to discipline the prosecutor

---

[13]     Defendant's original Motion contains a list of subjects about which Levintsa would have testified, including his interviews with six of the alleged victims.  All of these subjects were included in the declaration as read to the jury.  Defendant's later filings in support of the Motion contain some additions not included in the declaration.  The responsibility for any failure to include relevant information lies solely with the party who drafted the declaration.

15

but to ensure that the defendant receives a fair trial.  Applying a per se rule in cases of weak or

cumulative testimony would do little to further that goal.

Defendant argues further that the declaration was incomplete and an inadequate substitute

for live testimony.  However, the Court allowed Defendant's counsel to include in the declaration

all information that Levintsa would have provided in his testimony.  The responsibility for any

failure to include relevant information lies solely with the party who drafted the declaration.[14]

Further, while courts have recognized that a written declaration may not be an adequate

substitute for live testimony, see United States v. Hammond, 598 F.2d 1008, 1014 (5th Cir.

1979), Defendant's argument that Levintsa would have been more credible had he testified in

front of the jury ignores two crucial points.  First, the credibility of Levintsa's declaration was

never challenged by the Government.[15]  Second, and more important, Defendant's argument

ignores the efforts undertaken by the Court to render harmless any prejudice by admitting the

declaration without cross-examination and by employing a "liberal interpretation" of evidentiary

---

[14]    Defendant also argues that the events presented in the declaration "are condensed
to provide just the basic facts with little detail that could verify their authenticity or explanations
that would have given them greater weight."  Def. Second Supplemental Mem. 11.  Defendant
points to no place in the record, however, where the Court required him to "condense" the
declaration.

[15]    Indeed, the Government referred to the declaration only once throughout the trial,
and in that single reference, it assumed that Levintsa's statement about his meetings with the
boys was true.  See July 31, 2007 N.T. 140 ("Mr. Levintsa—the declaration—he goes through
the village the day before they were leaving for the United States with Ion Gusin's brother,
another man, and a video camera.  And he wants to interview them.  And the boys tell them
nothing happened.  Do you think these boys are going to tell a stranger walking through their
village the most shameful thing that ever happened to them?  When he's got video camera?
What a surprise.").

rules.  Oct. 20, 2008 Hr'g Tr. 12.[16]  Moreover, Defendant clearly was not prejudiced by the

absence of live testimony that would have been impermissible hearsay or rejected as irrelevant.[17]

Therefore, even assuming that the Government's decision to notify defense counsel of the

arrest warrant improperly deprived Defendant of Levintsa's live testimony, the Court concludes

that that conduct was harmless, given the extraordinary steps taken to remedy any prejudice.  As

the Supreme Court has explained, the overriding question before the Court is not whether the

Government acted inappropriately, but whether Defendant received a fair trial.  See Phillips, 455

U.S. at 219.  Based on the overwhelming evidence presented against Defendant at trial and the

limited value of Levintsa's live testimony, the Court concludes that Defendant received a fair

trial.[18]

### B.   Compulsory Process Under the Sixth Amendment

The Supreme Court has "borrowed much of [its] reasoning with respect to the

---

[16]   Although Defendant speculates that Levintsa, whom he refers to as "one of the leading lawyers in the country" of Moldova, Def. Second Supplemental Mem. 8, would have excelled under cross-examination and thereby "enhanced his credibility with the jury," id. at 9, the fact remains: the Government never challenged the credibility of Levintsa's statements in the declaration.

[17]   For example, Defendant contends that Levintsa could have testified "to his experiences with young Moldovan males trying to extort money from wealthy tourists, particularly Americans."  Def. Second Supplemental Mem. 13.

[18]   In addition to the trial testimony of the alleged victims, the evidence against Defendant included, inter alia, phone records reflecting numerous calls to several of the alleged victims; a notebook listing the names and phone numbers of many of the alleged victims and containing what the Government argued were "coded admissions" of sexual abuse; a wiretapped telephone call in which Defendant admitted that due to "very damaging" statements from one alleged victim, he was having a difficult time preparing a defense; a photograph of a scooter Defendant had shipped to one alleged victim; and statements from Romanian witnesses that they had seen Defendant sleep in the same bed as one of the alleged victims and had purchased a television set for the alleged victim's family.

17

Compulsory Process Clause of the Sixth Amendment from [its] cases involving the Due Process

Clause of the Fifth Amendment." Valenzuela-Bernal, 458 U.S. at 871. Therefore, as with

Defendant's Fifth Amendment claim, the Court must consider whether he has made a showing of

materiality. When examining the right to compulsory process guaranteed by the Sixth

Amendment, "more than the mere absence of testimony is necessary to establish a violation of

the right." Id. at 867 (citing Washington v. Texas, 388 U.S. 14 (1967)). A defendant "must at

least make some plausible showing of how [the] testimony would have been both material and

favorable to his defense." Id.; see also Mills, 956 F.2d at 446.

Relying on Supreme Court precedent, the Third Circuit has stated that for a defendant to

establish that he was convicted in violation of his Sixth Amendment right to compulsory process,

he must show: (1) that he was deprived of the opportunity to present evidence in his favor; (2)

that the excluded testimony would have been material and favorable to his defense; and (3) that

the deprivation was arbitrary or disproportionate to any legitimate evidentiary or procedural

purpose. Mills, 956 F.2d at 446.[19] Evidence is material "only if there is a reasonable likelihood

that the testimony could have affected the judgment of the trier of fact." Id. (quoting Valenzuela-

Bernal, 458 U.S. at 874). A "reasonable likelihood" is "a probability sufficient to undermine

confidence in the outcome." Id. (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)).

The Government cites Buie v. Sullivan, 923 F.2d 10 (2d Cir. 1990), in support of its

position that obtaining an arrest warrant against Levintsa did not violate Defendant's Sixth

---

[19]     As discussed above, the Mills court in dicta stated that Morrison's per se rule
applies in cases of prosecutorial misconduct. In light of the extensive discussion above as to why
the per se rule no longer applies, the Court will apply the Mills test to the facts of this case,
despite the Mills court's reference to the Morrison rule.

Amendment right to compulsory process.  In <u>Buie</u>, an eyewitness told the defense that he would testify that the defendant was not involved in the robbery at issue; however, the day after the trial began, the eyewitness was arrested and charged as an accomplice to the robbery.  923 F.2d at 11. The eyewitness invoked his Fifth Amendment privilege when called to testify at the defendant's trial, and the defense moved for a mistrial, arguing that the police had arrested the eyewitness to prevent him from offering exculpatory testimony about the defendant.  <u>Id.</u>  In habeas proceedings, the defendant argued that the state, in bad faith, arrested the eyewitness to prevent him from testifying.  The Court of Appeals concluded that "there is no evidence to conclude that the reason for [the eyewitness's] arrest was anything other than the prosecutor's determination of probable cause for believing that [the eyewitness] participated in the robbery.  Speculation such as that offered by [the defendant] does not permit a determination of bad faith on the part of the prosecutor, much less a conclusion that the district court's finding of no bad faith was clearly erroneous."  <u>Id.</u> at 12-13.  The Court of Appeals went on to note that the timing of the arrest was not sufficient to establish either bad faith or a violation of the defendant's Sixth Amendment rights, but that even if the timing had been improper, there still would have been "no basis for reversal because such an error did not 'infect' the fundamental fairness of his trial."  <u>Id.</u> at 13 (noting that the evidence overwhelmingly supported the defendant's guilt).

As discussed <u>supra</u>, Defendant has failed to demonstrate that he suffered more than harmless error at trial.  Even assuming that the Government acted in bad faith to prevent a defense witness from testifying, the resulting "error" did not "infect the fundamental fairness of his trial" because the Court allowed Defendant to present all of Levintsa's testimony to the jury through a declaration which was not subject to cross-examination or a rigorous application of the

Federal Rules of Evidence.  Accordingly, the Court finds no violation of Defendant's right to compulsory process.  See United States v. Capozzi, 883 F.2d 608, 614-15 (8th Cir. 1989) (finding no Sixth Amendment violation where the trial court allowed the defendant to present as evidence relevant portions of earlier sworn testimony of three defense witnesses who refused to testify after being named as unindicted co-conspirators in the Government's bill of particulars, and where the defendant failed "to delineate any suggested testimony over and above that which was presented to the jury").

### C.    Assistance of Counsel[20]

The Sixth Amendment guarantees criminal defendants the right to assistance of counsel in their defense.  See, e.g., United States v. Kikumura, 947 F.2d 72, 78 (3d Cir. 1991) (finding no Sixth Amendment violation where the trial court refused to grant a continuance so that the defendant could appear with his chosen counsel).  In interpreting this right, courts have held that due process demands that a defendant "be afforded an opportunity to obtain the assistance of

---

[20]    The Court notes that Defendant's contention that Levintsa was to act as both witness and counsel at trial is in tension with prevailing public policy.  While there is not an absolute prohibition against an attorney testifying at the very proceeding at which he represents his client, the Third Circuit has stated that "[o]rdinarily it is inappropriate for an attorney, or a lawyer in his firm, to testify on behalf of a client."  Universal Athletic Sales Co. v. Am. Gym, Recreational & Athletic Equip. Corp., 546 F.2d 530, 538 (3d Cir. 1976) (referring to Rule DR 5-102 of the Code of Professional Responsibility, which provides that a lawyer shall withdraw as counsel if the "lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client").  Pennsylvania Rule of Professional Conduct 3.7 provides: "A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless: (1) the testimony relates to an uncontested issue; (2) the testimony relates to the nature and value of legal services rendered in the case; or (3) disqualification of the lawyer would work substantial hardship on the client."  Any exceptions to this so-called advocate-witness rule are to be construed "narrowly" to insure that the proper weight is afforded the policy that "the roles of advocate and witness are fundamentally incompatible."  J.D. Pflaumer, Inc. v. U.S. Dep't of Justice, 465 F. Supp. 746, 748 (E.D. Pa. 1979).

counsel of his choice to prepare and carry out his defense." Id.  However, the Third Circuit has "long held that the Sixth Amendment does not guarantee criminal defendants an absolute right to counsel of their choice." Id.  "Due process is satisfied so long as the accused is afforded a fair and reasonable opportunity to obtain his chosen counsel and there is no arbitrary action prohibiting the effective use of such counsel." Id.

The Supreme Court has noted that "[c]ases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." United States v. Morrison, 449 U.S. 361, 364 (1981).  "[C]ertain violations of the right to counsel may be disregarded as harmless error." Id. at 365.  Absent an adverse impact on "the effectiveness of counsel's representation . . . or some other prejudice to the defense . . . . there is no basis for imposing a remedy in [a] proceeding, which can go forward with full recognition of the defendant's right to counsel and to a fair trial." Id.  "More particularly, absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate." Id.

Defendant argues that Levintsa's assistance as counsel at trial was crucial because he speaks Moldovan and Russian as well as English and is familiar with the culture and legal procedures and practices in Moldova.  See Def. Mot. 4.  He contends that defense counsel relied heavily on Levintsa in preparation for trial, and expected him to continue to provide assistance during the trial by advising on the cross-examination of Moldovan witnesses,[21] translating

---

[21]     As the Government points out, Defendant has argued himself into a paradox: If Levintsa were in fact the "key defense witness" in this case, he would have been sequestered when other witnesses, such as Officer Durnea, testified.  Accordingly, even without the

Moldovan documents, advising on the accuracy of the court translator's translation of Moldovan

testimony, and advising counsel on facts local to Moldova as well as cultural factors that might

bear on evidence as it developed at trial.[22]  See id.

      Defendant received zealous and effective representation at trial from eminent counsel of

his choosing, and he fails to point to any specific evidence impacted by the failure to have

Levintsa present as counsel.  The translators used at trial were court-appointed, and the defense

has offered no evidence that the translation was problematic.  Similarly, the defense has pointed

to no specific instances in which Levintsa's knowledge of Moldovan culture would have been

useful, nor has it explained why such knowledge was unattainable by telephone or other forms of

communication.  Vague, unsubstantiated assertions of prejudice are insufficient to grant the

extreme relief Defendant seeks.


**IV.    CONCLUSION**

      Because the prosecutorial misconduct did not deprive the Defendant of a fair trial,

Defendant's Motion will be denied.  An appropriate Order follows.

---

Government's conduct preventing him from attending trial as a witness, Levintsa would have
been unable to assist at trial during cross-examination of witnesses.  Any role Levintsa would
have had in cross-examination, therefore, was precisely the role he was able to play even with the
Government's conduct: he would have been able to assist in preparing for cross-examination,
whether by telephone from Moldova or in person in the United States.

[22]     Defendant fails to explain why Levintsa was unable to advise counsel on local
facts and cultural factors by telephone from Moldova.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO. 06-19** |
| | : | |
| **ANTHONY MARK BIANCHI** | : | |

**ORDER**

**AND NOW**, this 8th day of January, 2009, upon consideration of Defendant's Motion for Judgment of Acquittal or New Trial (docket no. 201) and all responses and replies thereto, and for the reasons stated in the accompanying Memorandum, it is **ORDERED** that the Motion is **DENIED**.

BY THE COURT:


 S/ BRUCE W. KAUFFMAN
**BRUCE W. KAUFFMAN,   J.**

23